**HERMAN JONES LLP**
SERINA M. VASH
153 Central Avenue #131
Westfield, NJ 07090
svash@hermanjones.com
Telephone: (404) 504-6516
Facsimile: (404) 504-6501

[Additional Counsel on Signature Page]

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TRACY BYNUM, Derivatively on Behalf of JOHNSON & JOHNSON, | ) Case No. |
| | ) |
| | ) VERIFIED STOCKHOLDER |
| Plaintiff, | ) DERIVATIVE COMPLAINT FOR |
| v. | ) BREACH OF FIDUCIARY DUTY AND |
| | ) UNJUST ENRICHMENT |
| ALEX GORSKY, CAROL GOODRICH, | ) |
| MICHAEL E. SNEED, ANNE M. | ) |
| MULCAHY, CHARLES PRINCE, | ) |
| WILLIAM D. PEREZ, IAN E. L. DAVIS, | ) |
| RONALD A. WILLIAMS, A. EUGENE | ) |
| WASHINGTON, MARK B. MCCLELLAN, | ) |
| D. SCOTT DAVIS, MARY C. BECKERLE, | ) |
| JOAN CASALVIERI, and TARA | ) |
| GLASGOW, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| -and- | ) |
| | ) |
| JOHNSON & JOHNSON, a New Jersey | ) |
| Corporation, | ) |
| | ) |
| Nominal Defendant. | ) DEMAND FOR JURY TRIAL |
| | ) |
| | ) |

Plaintiff Tracy Bynum, located at 2100 Yucca Avenue, Fullerton, California, by her

attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty

and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the

- 1 -

allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Johnson & Johnson ("J&J" or the "Company") against certain of its officers and directors for breach of fiduciary duty and unjust enrichment. These wrongs resulted in billions of dollars in damages to J&J's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed J&J to billions of dollars in potential liability for violations of law.

2.      J&J manufactures, markets, and sells a variety of over-the-counter health care products, including body powders. JOHNSON'S® Baby Powder, the focus of this action, is a symbol of the Company's legacy and history, and considered to be a "sacred cow" among the Company's other offerings. The primary ingredient in JOHNSON'S Baby Powder is magnesium silicate, an inorganic mineral known as "talc."

3.      Nearly fifty years ago, researchers identified serious health risks associated with talc. Researchers first raised concerns about the safety of talc-based products and their potential asbestos contamination in the late 1960s and early 1970s. In the 1980s, scientific studies concluded that a woman's repeated use of talc-based body powders in her genital region significantly increases her risk of developing ovarian cancer.

4.      Defendants, however, assuaged concerns about the health risks associated with talc by repeatedly promising that J&J's products had a "long history of safe use," and were, and always

had been, free of asbestos.  For years, defendants' assured consumers and the market that J&J's cosmetic powder products have been safe "[f]or over 100 years," and that "regular testing conducted since the 1970s" had confirmed the absence of asbestos in J&J's products.  In support of these claims, defendants' claimed that J&J used "a sophisticated battery of tests designed to ensure … safety" and "always put[s]… safety first in everything that [it does]."

5.      These representations were false.  J&J's talc and talcum powders, including JOHNSON'S Baby Powder, have long been contaminated with asbestos.   And J&J's asbestos testing had not "confirmed" that the Company's talc or powders were "asbestos free," but rather the opposite—that J&J's talc-based products contained asbestos.  Moreover, far from putting "safety first," J&J purposefully avoided essential testing methods, which the Company knew were necessary for finding asbestos in talc.

6.      For years, the Company was repeatedly notified of the presence of asbestos in its talcum powders, yet continued to sell its harmful cancer-causing talc-based body powders. Internal memoranda dating back to the 1960s admit that J&J's talc contained "unavoidable trace amounts" of asbestos.  Further, from at least 1971 to the 2000s, the Company's raw talc and finished powders routinely tested positive for asbestos.  While Company executives, scientists, doctors and lawyers discussed the asbestos contamination, J&J failed to disclose it to regulators or the public.  Even after the Company internally recognized that "*we cannot say [our talc is] 'always*'" asbestos free, it continued selling and marketing its talcum powder products as safe.

7.      The Company was also aware of the need to utilize sophisticated concentration techniques in testing its talc for asbestos, yet failed to do so.  Decades ago, a J&J consultant informed the Company that "larger amounts of sample" must be tested to find asbestos, and that "preconcentrat[ing] the impurities prior to examination" "was considered essential to the success

of any suggested procedure."  J&J, however, declined to use these sophisticated concentration techniques.  This refusal was purposeful.  An internal J&J memorandum noted that the Company's talc, if subjected to the most sensitive testing method, using concentrated samples, will show at least traces of asbestos.  The internal memorandum described this sort of testing as both "sophisticated" and "disturbing," and noted that companies would "be hard pressed in supporting purity claims" if talc was subject to such testing.

8.     The truth about the Company's cancer-causing products and defendants' knowing concealment thereof began to emerge in September 2017, as J&J defended itself in its first trial alleging the presence of asbestos in JOHNSON'S Baby Powder.  On September 21, 2017, *Bloomberg* reported on documents from the 1970s that had been unsealed in the talc litigation, revealing that "J&J [was] [a]lerted to [the] *[r]isk* of [a]sbestos in [t]alc in [the] '70s."  But in the article, defendants vigorously denied the presence of asbestos in its products, stating "[h]istorical testing of samples by the [U.S. Food and Drug Administration ("FDA")] as well as "numerous independent" laboratories and scientists "have all confirmed the absence of asbestos in our talc products."

9.     Then, on February 5, 2018, Mesothelioma.net reported that experts in the talc litigation were "anticipating the release of numerous damaging internal company documents" from the Company relating to asbestos in its baby powder.  But defendants continued to defend J&J's talc products, falsely reassuring consumers and investors that such products "are, and always have been, free of asbestos" and that this was demonstrated by "decades of monitoring, testing and regulation dating back to the 1970s."

10.    Less than six months later, in July 2018, the Company was hit with a record-setting $4.69 billion verdict on claims that asbestos in its products gave ovarian cancer to twenty-two

women.  The jury in a Missouri circuit court awarded $4.14 billion in punitive damages and $550 million in compensatory damages to the women, who had accused the Company of failing to warn them about cancer risks associated with its baby and body powders.

11.     Then, on December 14, 2018, *Reuters* published an explosive report revealing new information, including previously unreleased internal J&J documents.  The *Reuters* report, titled "Special Report: J&J Knew for Decades that Asbestos Lurked in Its Baby Powder," exposed the Company's internal knowledge of asbestos contamination in J&J's talc-based products.  The report also explained that J&J had purposely avoided using concentration techniques in testing its talc products because such methods would detect asbestos in these products.

12.     The fallout from these revelations has been severe.  After *Reuter's* exposed the truth about J&J's deceptive business practices, the Company's stock price fell $14.84 per share, or more than 10%, to close at $133 per share on December 14, 2018, erasing nearly ***$40 billion*** of the Company's market capitalization.  In total, J&J lost more than ***$51 billion*** in market capitalization, from a high of $397 billion in January 2018 before the truth about the Company's cancer-causing products began emerging, to only $346 billion in the days after *Reuters* revealed J&J's harmful business practices.

13.     The wrongdoing detailed herein has also exposed the Company to significant liability arising from governmental investigations as well as lawsuits.  In particular, the Company is now the subject of two Employee Retirement Income Security Act of 1974 ("ERISA") class action lawsuits, a number of product liability lawsuits, and product liability multidistrict litigation pending in the U.S. District Court for the District of New Jersey.  Furthermore, as a direct result of the improper statements detailed herein, the Company is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for the District of New Jersey, on behalf of

investors who purchased J&J's stock at artificially inflated prices (the "Securities Class Action"). Finally, the Company has received inquiries and subpoenas from U.S. Senator Patty Murray, the U.S. Department of Justice, and the SEC related to the allegations detailed herein.

14.     Despite the threat to its customers' health and the significant liability resulting from these lawsuits and investigations, J&J refuses to place any cancer-related warning on the Company's talc-based products and continues to sell these products and market them as safe.

15.     On April 18, 2019, pursuant to New Jersey law, plaintiff sent a letter to the J&J Board of Directors (the "Board") demanding that the Board investigate the foregoing facts and claims arising from them, and commence litigation against the corporate fiduciaries responsible for damaging J&J (the "Demand").  In response, counsel from Sidley Austin LLP sent plaintiff's counsel a letter stating that the law firm of Gibson Dunn & Crutcher LLP was investigating the "underlying matters regarding the Company's talc products addressed in [the Demand]."  More than five months—far longer than the ninety days provided by statute—have passed since plaintiff first made her Demand, yet the Board has not provided a substantive response to the Demand.

16.     Given the Board's delay and the indefinite timeline for its investigation, plaintiff brings this action to timely address the wrongdoing discussed herein that harmed and continues to harm the Company.

## JURISDICTION AND VENUE

17.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

18.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise

of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) J&J maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to J&J, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

20.     Plaintiff Tracy Bynum was a stockholder of J&J at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current J&J stockholder.  Plaintiff is a citizen of California.

**Nominal Defendant**

21.     Nominal Defendant J&J is a New Jersey corporation with principal executive offices located at One Johnson & Johnson Plaza, New Brunswick, New Jersey.  Accordingly, J&J is a citizen of New Jersey.  J&J is a holding company with more than 260 operating subsidiaries. Through its subsidiaries, the Company engages in the research and development, manufacture, and sale of products in the health care field.  As of December 30, 2018, J&J had approximately 135,100 employees worldwide.

**Defendants**

22.     Defendant Alex Gorsky ("Gorsky") is J&J's Chairman of the Board and has been since December 2012; and Chief Executive Officer, Chairman of the Executive Committee, and a director and has been since April 2012.  Defendant Gorsky was also J&J's Vice Chairman of the Executive Committee from January 2011 to April 2012; a Member of the Executive Committee from January 2009 to January 2011; Worldwide Chairman, Medical Devices and Diagnostics Group from September 2009 to January 2011; Worldwide Chairman, Surgical Care Group from January 2009 to September 2009; Company Group Chairman and Worldwide Franchise Chairman for Ethicon, Inc., a subsidiary of the Company, from 2008 to January 2009; and held other various positions of increasing responsibility at the Company and its subsidiaries from 1988 to 2004. Defendant Gorsky is named as a defendant in the Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Defendant Gorsky knowingly, recklessly, or with gross negligence caused or allowed the Company to: (i) improperly market J&J's talc-based powders as safe, and promote the perineal use of those products by women; (ii) fail to adequately warn of known health risks associated with J&J's talc-based powders; and (iii) make improper statements in the Company's press releases and public filings concerning the quality and health risks associated with J&J's products.  J&J paid defendant Gorsky the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Non-Qualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2018 | $1,642,308 | $10,319,463 | $4,305,594 | $3,570,497 | - | $259,710 | $20,097,572 |
| 2017 | $1,600,000 | $12,354,361 | $5,054,398 | $3,598,382 | $6,959,144 | $236,279 | $29,802,564 |
| 2016 | $1,600,000 | $10,608,901 | $4,118,398 | $4,652,556 | $5,663,771 | $228,094 | $26,871,720 |
| 2015 | $1,613,462 | $10,693,427 | $4,562,998 | $4,009,536 | $2,714,268 | $202,175 | $23,795,866 |
| 2014 | $1,500,000 | $9,467,380 | $4,168,139 | $5,018,779 | $4,606,142 | $228,866 | $24,989,306 |
| 2013 | $1,453,846 | $5,988,975 | $2,669,999 | $4,867,361 | $1,739,000 | $191,779 | $16,910,960 |

Defendant Gorsky is a citizen of Pennsylvania.

23.     Defendant Carol Goodrich ("Goodrich") is J&J's Director of Corporate Media Relations and has been since 2009.  Defendant Goodrich is named as a defendant in the Securities Class Action complaint that alleges she violated sections 10(b) and 20(a) of the Exchange Act. Defendant Goodrich knowingly, recklessly, or with gross negligence caused or allowed the Company to: (i) improperly market J&J's talc-based powders as safe, and promote the perineal use of those products by women; (ii) fail to adequately warn of known health risks associated with J&J's talc-based powders; and (iii) make improper statements in the Company's press releases and public filings concerning the quality and health risks associated with J&J's products.  Defendant Goodrich is a citizen of Pennsylvania.

24.     Defendant Michael E. Sneed ("Sneed") is J&J's Chief Communications Officer and has been since 2012; Executive Vice President of Global Corporate Affairs and has been since January 2018; and a member of the Executive Committee and has been since July 2018. Defendant Sneed was also Vice President of Global Corporate Affairs from 2012 to January 2018; Company Group Chairman, Vision Care Franchise from 2007 to 2012; Company Group Chairman, Consumer North America from 2004 to 2007; and held various positions of increasing responsibility across the global enterprise from 1986 to 2004.  Defendant Sneed is named as a defendant in the Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Sneed knowingly, recklessly, or with gross negligence caused or allowed the Company to: (i) improperly market J&J's talc-based powders as safe, and promote the perineal use of those products by women; (ii) fail to adequately warn of known health risks associated with J&J's talc-based powders; and (iii) make improper statements in the Company's

press releases and public filings concerning the quality and health risks associated with J&J's products.  Defendant Sneed is a citizen of Pennsylvania.

25.    Defendant Anne M. Mulcahy ("Mulcahy") is J&J's Lead Director and has been since December 2012 and a director and has been since October 2009.  Defendant Mulcahy is a member of J&J's Audit Committee and has been since at least March 2013.  Defendant Mulcahy knowingly or recklessly caused or allowed the Company to: (i) improperly market J&J's talc-based powders as safe, and promote the perineal use of those products by women; (ii) fail to adequately warn of known health risks associated with J&J's talc-based powders; and (iii) make improper statements in the Company's press releases and public filings concerning the quality and health risks associated with J&J's products.  J&J paid defendant Mulcahy the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $150,000 | $184,940 | $20,000 | $354,940 |
| 2017 | $145,000 | $174,893 | - | $319,893 |
| 2016 | $140,000 | $164,985 | $20,000 | $324,985 |
| 2015 | $140,000 | $154,899 | $20,000 | $314,899 |
| 2014 | $140,000 | $154,924 | $20,000 | $314,924 |
| 2013 | $140,000 | $144,989 | - | $284,989 |

Defendant Mulcahy is a citizen of Connecticut.

26.    Defendant Charles Prince ("Prince") is a J&J director and has been since February 2006.  Defendant Prince is the Chairman and a member of J&J's Regulatory Compliance Committee and has been since at least March 2017.  Defendant Prince knowingly or recklessly caused or allowed the Company to: (i) improperly market J&J's talc-based powders as safe, and promote the perineal use of those products by women; (ii) fail to adequately warn of known health risks associated with J&J's talc-based powders; and (iii) make improper statements in the

Company's press releases and public filings concerning the quality and health risks associated with J&J's products.  J&J paid defendant Prince the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $135,000 | $184,940 | $20,000 | $339,940 |
| 2017 | $130,000 | $174,893 | $20,000 | $324,893 |
| 2016 | $130,000 | $164,985 | $20,000 | $314,985 |
| 2015 | $130,000 | $154,899 | $20,000 | $304,899 |
| 2014 | $130,000 | $154,924 | - | $284,924 |
| 2013 | $130,000 | $144,989 | $20,524 | $295,513 |

Defendant Prince is a citizen of Florida.

27.     Defendant William D. Perez ("Perez") is a J&J director and has been since June 2007.  Defendant Perez is a member of J&J's Audit Committee and has been since at least March 2017.  Defendant Perez knowingly or recklessly caused or allowed the Company to: (i) improperly market J&J's talc-based powders as safe, and promote the perineal use of those products by women; (ii) fail to adequately warn of known health risks associated with J&J's talc-based powders; and (iii) make improper statements in the Company's press releases and public filings concerning the quality and health risks associated with J&J's products.  J&J paid defendant Perez the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $135,000 | $184,940 | $20,000 | $339,940 |
| 2017 | $130,000 | $174,893 | $20,000 | $324,893 |
| 2016 | $130,000 | $164,985 | $20,000 | $314,985 |
| 2015 | $130,000 | $154,899 | $20,000 | $304,899 |
| 2014 | $130,000 | $154,924 | - | $284,924 |
| 2013 | $130,000 | $144,989 | $20,000 | $294,989 |

Defendant Perez is a citizen of Florida.

28.     Defendant Ian E. L. Davis ("I. Davis") is a J&J director and has been since July 2010.  Defendant I. Davis is a member of J&J's Audit Committee and has been since at least March 2012, and a member of the Regulatory Compliance Committee and has been since at least March

2017. Defendant I. Davis was previously a member of J&J's Public Policy Advisory Committee in at least March 2012. Defendant I. Davis knowingly or recklessly caused or allowed the Company to: (i) improperly market J&J's talc-based powders as safe, and promote the perineal use of those products by women; (ii) fail to adequately warn of known health risks associated with J&J's talc-based powders; and (iii) make improper statements in the Company's press releases and public filings concerning the quality and health risks associated with J&J's products. J&J paid defendant I. Davis the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $115,000 | $184,940 | $299,940 |
| 2017 | $110,000 | $174,893 | $284,893 |
| 2016 | $110,000 | $164,985 | $274,985 |
| 2015 | $110,000 | $154,899 | $264,899 |
| 2014 | $110,000 | $154,924 | $264,924 |
| 2013 | $110,000 | $144,989 | $254,989 |

Upon information and belief, defendant I. Davis is a citizen of the United Kingdom

29.     Defendant Ronald A. Williams ("Williams") is a J&J director and has been since June 2011. Defendant Williams was previously the Chair of J&J's Regulatory Compliance Committee in at least March 2016, a member of that committee from at least March 2013 to at least March 2016, and a member of the Public Policy Advisory Committee in at least March 2012. Defendant Williams knowingly or recklessly caused or allowed the Company to: (i) improperly market J&J's talc-based powders as safe, and promote the perineal use of those products by women; (ii) fail to adequately warn of known health risks associated with J&J's talc-based powders; and (iii) make improper statements in the Company's press releases and public filings concerning the quality and health risks associated with J&J's products. J&J paid defendant Williams the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $135,000 | $184,940 | $20,000 | $339,940 |
| 2017 | $130,000 | $174,893 | $20,000 | $324,893 |
| 2016 | $130,000 | $164,985 | $20,000 | $314,985 |
| 2015 | $125,003 | $154,899 | $20,000 | $299,902 |
| 2014 | $110,000 | $154,924 | $20,000 | $284,924 |
| 2013 | $110,000 | $144,989 | - | $254,989 |

Defendant Williams is a citizen of Florida.

30.     Defendant A. Eugene Washington ("Washington") is a J&J director and has been since November 2012.  Defendant Washington was previously a member of J&J's Regulatory Compliance Committee from at least March 2013 to at least March 2014.  Defendant Washington knowingly or recklessly caused or allowed the Company to: (i) improperly market J&J's talc-based powders as safe, and promote the perineal use of those products by women; (ii) fail to adequately warn of known health risks associated with J&J's talc-based powders; and (iii) make improper statements in the Company's press releases and public filings concerning the quality and health risks associated with J&J's products.  J&J paid defendant Washington the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $135,000 | $184,940 | $20,000 | $339,940 |
| 2017 | $110,000 | $174,893 | - | $284,893 |
| 2016 | $110,000 | $164,985 | $20,000 | $294,985 |
| 2015 | $110,000 | $154,899 | $20,000 | $284,899 |
| 2014 | $110,000 | $154,924 | $2,000 | $266,924 |
| 2013 | $110,000 | $144,989 | $5,772 | $260,761 |

Defendant Washington is a citizen of North Carolina.

31.     Defendant Mark B. McClellan ("McClellan") is a J&J director and has been since October 2013.  Defendant McClellan is a member of J&J's Regulatory Compliance Committee and has been since at least March 2014.  Defendant McClellan knowingly or recklessly caused or allowed the Company to: (i) improperly market J&J's talc-based powders as safe, and promote the

perineal use of those products by women; (ii) fail to adequately warn of known health risks associated with J&J's talc-based powders; and (iii) make improper statements in the Company's press releases and public filings concerning the quality and health risks associated with J&J's products.  J&J paid defendant McClellan the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $115,000 | $184,940 | $299,940 |
| 2017 | $110,000 | $174,893 | $284,893 |
| 2016 | $110,000 | $164,985 | $274,985 |
| 2015 | $110,000 | $154,899 | $264,899 |
| 2014 | $110,000 | $154,924 | $264,924 |
| 2013 | $27,500 | - | $27,500 |

Defendant McClellan is a citizen of North Carolina.

32.     Defendant D. Scott Davis ("S. Davis") is a J&J director and has been since June 2014.  Defendant S. Davis is the Chair of J&J's Audit Committee and has been since at least March 2016, and a member of that committee and has been since at least March 2015.  Defendant S. Davis was previously a member of J&J's Regulatory Compliance Committee from at least March 2015 to at least March 2016.  Defendant S. Davis knowingly or recklessly caused or allowed the Company to: (i) improperly market J&J's talc-based powders as safe, and promote the perineal use of those products by women; (ii) fail to adequately warn of known health risks associated with J&J's talc-based powders; and (iii) make improper statements in the Company's press releases and public filings concerning the quality and health risks associated with J&J's products.  J&J paid defendant S. Davis the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $140,000 | $184,940 | $324,940 |
| 2017 | $135,000 | $174,893 | $309,893 |
| 2016 | $135,000 | $164,985 | $299,985 |
| 2015 | $128,750 | $154,899 | $283,649 |
| 2014 | $58,366 | - | $58,366 |

Upon information and belief, defendant S. Davis is a citizen of Georgia.

33.     Defendant Mary C. Beckerle ("Beckerle") is a J&J director and has been since June 2015.  Defendant Beckerle is a member of J&J's Regulatory Compliance Committee and has been since at least March 2017.  Defendant Beckerle knowingly or recklessly caused or allowed the Company to: (i) improperly market J&J's talc-based powders as safe, and promote the perineal use of those products by women; (ii) fail to adequately warn of known health risks associated with J&J's talc-based powders; and (iii) make improper statements in the Company's press releases and public filings concerning the quality and health risks associated with J&J's products.  J&J paid defendant Beckerle the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $135,000 | $184,940 | $20,000 | $339,940 |
| 2017 | $130,000 | $174,893 | $20,000 | $324,893 |
| 2016 | $111,667 | $164,985 | $17,800 | $294,452 |
| 2015 | $64,167 | - | - | $64,167 |

Defendant Beckerle is a citizen of Utah.

34.     Defendant Joan Casalvieri ("Casalvieri") was Director of Toxicology and Skincare at Johnson & Johnson Consumer Inc. ("JJCI").  Defendant Casalvieri is named as a defendant in the Securities Class Action complaint that alleges she violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Casalvieri knowingly, recklessly, or with gross negligence caused or allowed the Company to: (i) improperly market J&J's talc-based powders as safe, and promote the perineal use of those products by women; (ii) fail to adequately warn of known health risks associated with J&J's talc-based powders; and (iii) make improper statements in the Company's press releases and public filings concerning the quality and health risks associated with J&J's products.  Defendant Casalvieri is a citizen of New Jersey.

35.     Defendant Tara Glasgow ("Glasgow") was JJCI's Vice President of Baby R&D and Scientific Engagement from March 2014 to at least September 2016; and Vice President of Wound

Closure and Repair at Ethicon, Inc., a subsidiary of the Company, from April 2017 to at least September 2018.  Defendant Glasgow was also JJCI's Senior Director of Oral Care Product Development and Innovation from October 2011 to March 2014, and held various positions of increasing responsibility at JJCI from 1995 to 2008.  Defendant Glasgow is named as a defendant in the Securities Class Action complaint that alleges she violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Glasgow knowingly, recklessly, or with gross negligence caused or allowed the Company to: (i) improperly market J&J's talc-based powders as safe, and promote the perineal use of those products by women; (ii) fail to adequately warn of known health risks associated with J&J's talc-based powders; and (iii) make improper statements in the Company's press releases and public filings concerning the quality and health risks associated with J&J's products.  Upon information and belief, defendant Glasgow is a citizen of the United Kingdom.

36.     The defendants identified in ¶¶22-24, 34-35 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶22, 25-33 are referred to herein as the "Director Defendants."  Collectively, the defendants identified in ¶¶22-35 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

Fiduciary Duties

37.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe J&J and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage J&J in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of J&J and not in furtherance of their personal interest or benefit.

- 16 -

38.     To discharge their duties, the officers and directors of J&J were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of J&J were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)     ensure that the Company complied with its legal obligations and requirements, and refrain from engaging in deceptive conduct;

(c)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(d)     remain informed as to how J&J conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**J&J's Principles of Corporate Governance and Code of Business Conduct Impose Additional Responsibilities on the Defendants**

39.     The Individual Defendants, like all employees, directors, and officers of the Company, were required to comply with J&J's Principles of Corporate Governance (the "Corporate Governance Principles") and Code of Business Conduct (the "Code of Conduct").  The Individual Defendants were also required to comply with the Company's Code of Business Conduct & Ethics

for Members of the Board of Directors and Executive Officers (the "D&O Code of Conduct").[1]
The Corporate Governance Principles state the following with respect to the responsibilities of the
Board:

> **Responsibilities of the Board**. All Directors are elected annually by the
> shareholders as their representatives in providing oversight of the operation of the
> Company. The Directors select, oversee and monitor the performance of the senior
> management team, which is charged with the day-to-day conduct of the Company's
> business. The fundamental responsibility of the Directors is to exercise their
> business judgment on matters of critical and long-term significance to the Company
> in furtherance of what they reasonably believe to be in the best interest of the
> Company, and therefore its shareholders.

40.     In addition to the duties described above, the Company vouched to conduct its
business in accordance with applicable laws and regulations.  To that effect, both the Code of
Conduct and the D&O Code of Conduct required the Company's officers and directors to comply
with all laws, rules, and regulations, and the D&O Code of Conduct further required the Individual
Defendants to "use all reasonable efforts to oversee compliance by employees, other Directors and
other Executive Officers with all applicable laws, rules and regulations."  The Code of Conduct
provided the following with respect to legal and regulatory compliance:

> We aspire to bring the highest standards and level of integrity to each of these
> business activities by:
>
> ➢ Complying with the laws, standards and regulations that apply to our
>   products and processes (such as quality regulations and standards);
>
> ➢ Upholding ethical, scientific and clinical standards and complying with all
>   laws and regulations in all research and development activities worldwide;
>
> ➢ Ensuring the safety of patients and volunteers who take part in clinical trials,
>   protecting their confidentiality and complying with data protection laws;

---

[1] The D&O Code of Conduct refers to the Code of Business Conduct & Ethics for Members of the
Board of Directors and Executive Officers updated March 7, 2016.

➢ Complying with the laws and regulations that cover gaining marketing authorization to sell our products and interacting with regulators and other government officials;

➢ Adhering to the applicable manufacturing, packaging, distribution and export laws and regulations for our industry and in the countries where we do business;

➢ Following all laws and regulations regarding the promotion, marketing and sales of our products, including ensuring that what we say is truthful, not misleading, and is consistent with regulatory approvals for our products;

➢ Complying with all laws relating to product quality and safety, consistently monitoring the safety, quality and performance of our products and complying with all requirements for reporting adverse events and product quality complaints.

41.     Thus, J&J's Corporate Governance Principles and its Codes of Conduct made clear that the Individual Defendants were tasked with taking all necessary and appropriate steps to make sure that the Company, including its highest management, complied with all applicable internal policies and fair business practices.

**Breaches of Duties**

42.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of J&J, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

43.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to: (i) unlawfully market J&J's talc-based products as safe, and promote the perineal use of those products by women; (ii) sell products contaminated with cancer-causing-asbestos; (iii) fail to warn of the cancer-related risks associated with its talc-based products; and (iv) issue false and misleading statements about

the safety and testing of J&J's products, and conceal the truth about the Company's harmful cancer-causing body powders.  These improper practices wasted the Company's assets, and caused J&J to incur substantial damage.

44.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of J&J, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, J&J has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

45.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

46.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the public, including consumers and stockholders of J&J, regarding the quality and health risks associated with the Company's products; and (ii) enhance the Individual Defendants' executive and directorial positions at J&J and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

47.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

48.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and unjust enrichment; and to conceal adverse information concerning the Company's business practices and the quality of its products.

49.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

50.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## J&J'S BODY POWDERS CONTAIN CANCER-CAUSING COMPOUNDS

51.     J&J manufactures, markets, and sells medical and health care products, including body powders and a variety of other over-the-counter products.  J&J's baby powder is considered to be a "sacred cow" among the Company's offerings.  According to the Company, "JOHNSON'S Baby Powder is an institution," passed down in daily rituals from parent to child.  Over the years, J&J has regularly reminded the public of the legacy and supposed benefits of JOHNSON'S Baby

Powder.  For example, a webpage on the Company's website in 2016, titled "The Facts on Talcum Powder Safety," boasted:

> *If you've ever cared for a baby, you've probably had JOHNSON'S® Baby Powder in your home*. Baby powder made from cosmetic talc is one of the JOHNSON'S® brand's oldest products and *a longtime part of baby care rituals*. It is hypoallergenic, helps eliminate friction and is clinically proven to be gentle and mild for your baby's skin. *The clean, classic scent is comforting and familiar for parents and children alike*.

52.     While J&J promotes its baby powder by associating it with sentimental rituals and memories, its baby powder is essentially nothing more than ground up cancer-causing minerals. The principle ingredient of the Company's baby powder products is magnesium silicate, commonly known as talc, a naturally occurring mineral that is first mined and then ground into powder form. Talc is often naturally contaminated with asbestos—a group of six naturally occurring minerals composed of thin, needle-like fibers.  These "asbestiform" minerals include chrysotile, tremolite, actinolite, anthophyllite, amosite, and crocidolite.  Asbestos fibers can cause fatal diseases and cancers even when present in trace amounts.  As the World Health Organization and other authorities have made clear, *there is no known safe level of exposure to asbestos*.

53.     Numerous clinical studies have also linked the use of talcum powder with ovarian cancer.  In 1971, Dr. W.J. Henderson published the first study suggesting a link between talc and ovarian cancer.[2]  Then, in the early 1980s, researchers found evidence of an association between talcum powder usage for personal hygiene and ovarian cancer.  In 1982, Dr. Daniel W. Cramer and others performed the first epidemiologic study on talc powder use in the female genital area and found a significantly increased risk of ovarian cancer in women who reported genital talc use.

---

[2] *See* W.J. Henderson et al., *Talc and Carcinoma of the Ovary and Cervix*, 78 BJOG: An Int'l J. of Obstet. & Gynecol. 266-72 (1971).

54.     Since Dr. Cramer's study was published, numerous other studies found a link between talc and ovarian cancer.  The vast majority of these studies reported an elevated risk of ovarian cancer associated with genital talc use.  For example, in 1993, the National Toxicology Program of the U.S. Department of Health and Human Services published a study on the toxicity of nonasbestiform talc and found clear evidence of carcinogenic activity.  In 2000, Roberta B. Ness from the University of Pennsylvania, and others, conducted a case-control study of over 2,000 women and found a statistically significant 50% increase in the risk of ovarian cancer from genital talc use.[3]  Another study, published in 2000, found a 40% increase in invasive cancers in women who applied talcum powder to their perineum.[4]

55.     More recent studies confirm the link between ovarian cancer and the genital use of talc-based body powder.  In June 2013, a pooled analysis of over 18,000 women in eight case-control studies found a 20% to 30% risk of women developing ovarian cancer from genital talc powder use.  The study concluded that, "[b]ecause there are few modifiable risk factors for ovarian cancer, avoidance of genital powders may be a possible strategy to reduce ovarian cancer incidence."[5]  Likewise, a May 2016 study of African-American women concluded that talc-based

---

[3] *See* Roberta B. Ness et al., *Factors Related to Inflammation of the Ovarian Epithelium and Risk of Ovarian Cancer*, 11 Epidemiology 111-17 (2000).

[4] Dorota M. Gertig et al., *Prospective Study of Talc Use and Ovarian Cancer*, 92 JNCI: J. of the Nat'l Cancer Inst. 249-52 (2000).

[5] Kathryn L. Terry et al., *Genital Powder Use and Risk of Ovarian Cancer: A Pooled Analysis of 8,525 Cases and 9,859 Controls*, 6 Cancer Prevention Research 811-21 (2013).

body powder was associated with ovarian cancer and constituted a significant modifiable risk factor among that population.[6]

56.     According to a March 12, 2019 *Law360* article titled, "Talc Use Increases Risk of Ovarian Cancer, Lawmakers Told," "[d]ata from nearly 40 published studies show that women who use talcum powder have a 20 to 30 percent higher risk of developing the most common type of ovarian cancer than women who don't use it."  The article further stated:

> Dr. Anne McTiernan, a researcher at the University of Washington, said at a congressional hearing that she had reviewed the science linking the use of talcum powder, identifying 38 epidemiological studies in the past 40 years that asked women about their use of talcum powder on their genitals and tested associations with ovarian cancer. A summary of the data from the studies consistently shows that women who had used talcum powder in their genital areas had a statistically significant 22 to 31 percent increased risk of developing epithelial ovarian cancer, compared with women who had never used talcum powder, Dr. McTiernan said.
>
> "Evidence suggests that these associations hold across diverse race and ethnic groups," Dr. McTiernan, who prepared a report for consumers in multidistrict litigation over talcum powder and cancer, told the House Subcommittee on Economic and Consumer Policy. "These combined analyses also show increasing exposure to these products were also associated with increasing risk of ovarian cancer."
>
> In some studies, 4 in 10 women reported using talcum powder in their genital areas, including on sanitary pads and underwear, Dr. McTiernan said, noting that clinical and lab studies show that talc can migrate from the genital area to the ovarian and fallopian tube area.
>
> Talc has also been shown to cause inflammation, and increased levels of inflammation are associated with an increased risk of ovarian cancer, Dr. McTiernan said.

*             *             *

---

[6] *See* Joellen M. Schildkraut et al., *Association between Body Powder Use and Ovarian Cancer: the African American Cancer Epidemiology Study (AACES)*, 25 Cancer Epid. Bio. Prev. 1411-17 (2016).

Dr. McTiernan also said she looked at the literature on asbestos and ovarian cancer as well, noting that the International Agency for Research on Cancer said that a causal association between ovarian cancer and asbestos was clearly established.

"Women need to know about the risks of using talcum powder products in the genital areas and all consumers need to be informed about the contents of these products, including fibrous talc and asbestos, so they can make informed decisions about use," Dr. McTiernan said.

57.    Various governmental and non-governmental organizations have also warned of the adverse health consequence associated with talc usage by women.  In or around 2006, the Canadian Government, under the Hazardous Products Act and related Controlled Products Regulations, classified talc as a "D2A," "very toxic," "cancer causing substance."  In 2008, the Cancer Prevention Coalition submitted a petition to the FDA "Seeking a Cancer Warning on Cosmetic Talc Products."  The petition requested that the FDA require cosmetic talcum powder products to bear a prominent warning label that frequent perineal talc application increased the risk of ovarian cancer.

58.    In or about February 2010, the International Agency for Research on Cancer ("IARC"), an agency within the World Health Organization, published a report classifying perineal use of talc-based body powder as a "Group 2B" human carcinogen.  The IARC noted that studies from around the world had regularly found an increased risk of about 30-60% for ovarian cancer in women who applied talcum powder to their perineum.  As of today, both the National Cancer Institute and American Cancer Society list genital talc use as a risk factor for ovarian cancer.

**J&J IS REPEATEDLY INFORMED OF THE SEVERE HEALTH RISKS
ASSOCIATED WITH IT'S TALC-BASED PRODUCTS, YET CONTINUES
TO MARKET AND SELL THESE PRODUCTS AS SAFE**

59.    Internal documents dating back nearly fifty years show that the Company has long been aware of the severe health risks associated with its talc-based products.  Since the 1960s, J&J has been repeatedly informed that its talc-based products contain harmful cancer-causing asbestos.

The Company also received alerts of an association between talcum powder usage by women for personal hygiene and ovarian cancer.  Yet, J&J refused to place any cancer-related warning on the Company's talc-based products and continued to sell these products and market them as safe.

60.     By at least the late 1960s, J&J was aware that its talc-based products contained asbestos, and that these products posed severe health risks.  In 1967, J&J found traces of tremolite and another mineral that can occur as asbestos, according to a table attached to a November 1, 1967 memorandum by William Ashton ("Ashton"), J&J's former executive in charge of talc supply.  And in a 1969 memorandum to a Company doctor, Ashton said it was "normal" to find tremolite in many U.S. talc deposits.  He pointed out that "[h]istorically, in our Company, Tremolite has been bad," and suggested J&J rethink its approach.  In response, Dr. T.M. Thompson ("Thompson") indicated that Robert Wood "General" Johnson II, son of J&J cofounder Robert Wood Johnson, and numerous pediatricians had "express[ed] concern" about "adverse effects on the lungs of babies or mothers" as a result of asbestos exposure.  Thompson then went on to admit that J&J's talc contained "unavoidable trace amounts" of tremolite, and that these structures could penetrate deep inside the lungs, stating:

> [W]e have occasionally received inquiries from various individuals, including General Johnson and several pediatricians, *expressing concern over the possibility of the adverse effects on the lungs of babies or mothers* who might inhale any substantial amounts of our talc formulations. In the past, we have replied to the effect that since our talc is essentially all of the platelet-type of crystalline structure, and is of a size which would not be likely to *enter the pulmonary alveoli*, we would not regard the usage of our powders as presenting any hazard. Obviously, if we do include Tremolite in more than *unavoidable trace amounts*, this sort of negation of such inquiries could no longer pertain.

61.     Thompson also acknowledged that "if it became known that [J&J's] talc formulations contained any significant amount of Tremolite," the Company could face "such a

furor" that it would be "more or less compelled to remove [tremolite] from the formulation."  In

his response to Ashton, Thompson wrote:

> Some years ago, we were faced with a more or less serious problem resulting from what we consider to have been an unjust accusation of danger due to the presence of a small amount of boric acid in our talc. This ***created such a furor*** that we were more or less compelled to remove boric acid from the formulation. It is conceivable that ***a similar situation might eventually arise if it became known that our talc formulations contained any significant amount of Tremolite***.

62.     Thompson further warned that J&J could face litigation over Tremolite in its talc,

and advised the Company to consult with its law department, stating:

> Since the usage of these products is so widespread, and the existence of pulmonary disease is increasing, it is not inconceivable that ***we could become involved in litigation*** in which pulmonary fibrosis or other changes might be rightfully or wrongfully attributed to inhalation of our powder formulations. It might be that ***someone in the Law Department should be consulted with regard to the defensibility of our position*** in the event that such a situation could ever arise.

63.     A July 1971 memorandum by Wilson Nashed ("Nashed"), a Company scientist, to

J&J's public relations department further warned that "[t]he talc used in JOHNSON'S Baby

Powder" came from a Vermont mine containing "trace amounts of fibrous minerals

(tremolite/actinolite)."  The memorandum cautioned that while the talc went through a "washing

process," "three independent consulting laboratories" found that the resulting talc still had "traces

of fibrous minerals."  The July 1971 memorandum further stated:

> The talc used in JOHNSON'S Baby Powder is obtained from a selected mine in Vermont where the ore consists mainly of platy talc with only trace amounts of fibrous minerals (tremolite/actinolite). It is free of chrysotile fibers which may be called "pure asbestos" by the layman.
>
> The ore undergoes a careful purifying process which includes a 36-step washing process to maximize its content of high lubricity platy talc and to remove or substantially reduce any traces of fibrous minerals which may be present in the unrefined ore. The resulting talc has been shown by three independent consulting laboratories[] to contain negligible traces of fibrous minerals and no chrysotile fibers.

64.     In August 1972, Dr. Weissler, Director of the Division of Cosmetics at the FDA informed J&J that it had sent a sample of J&J's Shower to Shower talcum powder product to Sperry Rand, an outside laboratory, which reported "that ***asbestos fibers could be detected***."   J&J attempted to discredit the results, asking Dr. Weissler about the facility's experience and potential for lab contamination, but internally admitted the potential presence of tremolite fibers in its products.  A memorandum from Nashed to J&J regarding Dr. Weissler's findings stated:

> The report from Sperry Rand was that ***asbestos fibers could be detected*** in the sample. Dr. Weissler said that he has in front of him photographs of 6 fields at 12,000X magnification showing fibers with length to width ratios of 10-to-1 to 50-to-1....
>
> I asked Dr. Weissler if the Sperry Rand facility handles minerals. He said yes, they do a lot of work with chrysotile. I asked him, "Have they reported to you the normal background contamination in their samples. As you recall, this was the problem in Mt. Sinai's laboratories." He said no; however, he feels that the man who did the work is conservative and would not have reported chrysotile unless he was sure. ***I asked him if he has assured himself that the fibers were not tremolite which could be present in trace amounts. He said the fibers are characteristic of chrysotile*** and not tremolite.

65.     Numerous other internal Company documents from the 1970s further demonstrate J&J's awareness that its talc products contained harmful asbestos.  For example, a February 1973 Company memorandum illustrates that Fred Pooley, a J&J consultant, was working on a process to remove tremolite from talc.  While Tom Shelley ("Shelley"), Director of J&J's Central Research Laboratories, considered this to be potentially a "valuable patent" for the Company, after a little over a month of contemplation, Shelley determined that it would be in J&J's best interest to "keep the whole thing confidential" rather than "let ***the whole world know***" that J&J was trying to remove asbestos from its talc.

66.     Meanwhile, the Company purposely avoided essential testing methods that could detect the trace amounts of asbestos present in J&J's talc.  A May 1973 internal Company report

titled "Proposed Specs for Analyzing Talc for Asbestos" evidenced that J&J knew that asbestos

was present in the Company's talc and that concentration methods would allow laboratories to find

it, making such methods "too sensitive" for J&J's taste.  The report stated:

> England is considering method of preconcentrating the asbestos so as to be able to analyze by X-ray. They find no "asbestos" by doing this with Italian talc. ***They find (Pooley) 0.05% of a tremolite-type in Vermont***.

> \* \* \*

> Preconcentration of Asbestos followed by X-Ray Diffraction Analysis (Pooley Method)

> Dr. Pooley has developed two techniques for preconcentration of chrysotile and tremolite in talc followed by X-ray diffraction analysis.... The second technique developed also by Dr. Pooley involves preconcentration of tremolite in talc (different procedure) followed by X-ray diffraction analysis. This technique has not been written up yet, but evidently ***when applied to Vermont talc, 0.05% of tremolite-type is found. The limitation of this method is that it may be too sensitive***.

67.     In October 1973, J&J analyzed a proposed FDA regulation regarding the method

for determining the presence of asbestos in food and drugs, and determined that while the method

of analysis would "show that our talc is acceptable," "***if they change the method, we may have***

***problems***."  And in December 1973, J&J's own consultant, Colorado School of Mines Research

Institute, advised the Company that looking for trace amounts of asbestos in talc is like trying to

find a "needle in a haystack," and thus, a method of preconcentrating any asbestos content is

"essential" to detect asbestos:

> As the impurity level becomes very low ($\ll 1\%$), it is necessary to examine increasingly larger amounts of sample in order to detect the impurity. As a result of the requirement to detect the proverbial "***needle in a haystack***," we have evolved a procedure which preconcentrates the impurities prior to examination.

> \* \* \*

> The objective of this work was to develop a procedure to screen talc for the presence of chrysotile and tremolite-actinolite asbestos minerals. Based on past experiences

with detecting and identifying minerals when present at low levels, *a concentration of the phases to be detected was considered essential* to the success of any suggested procedure. Once concentrated the impurities could be detected by conventional methods of examination.

68.     In a November 1976 internal memorandum Ashton noted that if sensitive testing methods were implemented, the talc industry would be "hard pressed in supporting purity claims." Ashton further noted that this could "open up new problem areas with asbestos and talc minerals." In particular, Ashton's November 1976 memorandum stated:

Attached is a copy of *a disturbing proposal request* which the FDA has currently made available to qualified bidders. The scope of the work is the Separation of Asbestos in Foods, Drugs and Talc for Identification and Determination.

*I find this proposal more disturbing* than other proposals up to now because it aims at separation and isolation of asbestos from a wide scope of products and animal tissues. Up to now, our main problems have had to do with identification, whereas, now it looks like *the FDA is getting into separation and isolation methodology which will mean concentration procedures*. *As I have pointed out many times, there are many talcs on all markets which will be hard pressed in supporting purity claims*, when ultra sophisticated assay separation and isolation techniques are applied. Chances are that this FDA proposal will open up new problem areas with asbestos and talc minerals.

69.     In the years following, the Company was also warned that its products were linked to ovarian cancer.  For instance, in a September 1997 letter from Alfred Wehner ("Wehner") to J&J's Manager of Preclinical Toxicology, Michael Chudkowski, Wehner warned the Company to stop denying the connection between talc and ovarian cancer, stating:

Several investigators have independently reported talc particles in ovarian tissue. Simply citing the Battelle study and stating that it "demonstrated that talc does not translate (sic!) through the cervix to the uterine cavity and beyond does not address the problem....  All in all, in my opinion an inept response.

The problem with the response statement dated July 8, 1992, is more serious. The last sentence in the second paragraph states: "Finally, human studies on talc and cancer in industrial settings have shown that industrial exposure to talc, both by skin contact and inhalation, even at levels thousands of times higher than lifetime consumer exposure, presents no significant risk." This statement is outright false.

*   *   *

The response statement dated November 17, 1994, is just as bad. The second sentence in the third paragraph reads: "The workshop concluded that, although some of these studies suggest a weak association might exist, when taken together the results of the studies are insufficient to demonstrate any real association." This statement is also inaccurate, to phrase it euphemistically. At that time there had been about 9 studies (more by now) published in the open literature that did show a statistically significant association between hygienic talc use and ovarian cancer. Anybody who denies this risks that the talc industry will be perceived by the public like it perceives the cigarette industry: denying the obvious in the face of all evidence to the contrary.

70.    The Company also continued to receive alerts that its products contained harmful cancer-causing asbestos.  For instance, in an April 1998 letter to Mehaffy & Weber, lawyers for JJCI, Dr. Alice Blount stated that J&J's talc "contains trace amounts of asbestos."

### DEFENDANTS ALLOW THE COMPANY TO CONTINUE SELLING ITS CANCER-CAUSING TALC-BASED PRODUCTS DESPITE IMMENSE REGULATORY SCRUTINY AND A LITANY OF LAWSUITS

71.    The Company's sales of its cancer-causing talc-based products and failure to warn consumers of the health risks associated with these products has subject J&J to numerous lawsuits and regulatory investigations.   Nonetheless, defendants have not caused the Company to discontinue selling these products.  Indeed, J&J continues to sell its talc-based powders to this day and does not even include a cancer-related warning on these products.

72.    In October 2013, J&J experienced the first jury verdict in favor of a plaintiff linking the Company's baby powder to ovarian cancer.  Following this jury verdict, J&J updated its website with an increased emphasis on the safety of its talc.  But while the website represented that cosmetic talc had "a long history of safe use" after being "used for over 100 years," the draft language had actually refuted this claim and recognized that the use was not safe.  The draft language contained the following edit: "Talc has over 100 years of ~~safe~~ use in personal care products."  In addition, a comment in the draft copy stated that "***I don't think we can link cosmetic***

*talc to 100 years of use*."  Finally, the draft copy contained the admission that when it came to J&J's "talc-based consumer products," J&J "cannot say [they have] 'always'" been asbestos free.

73.     In May 2014, two individuals filed federal class action lawsuits against J&J alleging that the Company failed to warn of health risks associated with its talcum powder products.  And by June 2014, J&J faced similar allegations brought by the Attorney General of Mississippi, as well as in an action filed on behalf of dozens of plaintiffs in Missouri state court.  Despite the mounting litigation, defendants took no action to ensure the Company adequately warned of health risks posed by its products and continues to sell the talc-based products.

74.     In May 2017, J&J was ordered to pay more than $110 million to a woman who developed ovarian cancer after using the Company's talcum powder.[7]  Later that year, in August 2017, a California jury awarded a plaintiff a total of $417 million in damages in an ovarian cancer case, including $347 million in punitive damages.  Notwithstanding these verdicts and the hundreds of millions of dollars in judgments against the Company, defendants have yet to take any action to ensure the Company's warnings of cancer-related risks were adequate.

75.     Not long after these verdicts, plaintiffs began filing lawsuits alleging that the asbestos contained in J&J's talcum powder caused mesothelioma.  In September 2017, trial was set to begin in a case against J&J brought by Tina Herford, who alleged that she had developed mesothelioma because of exposure to asbestos contained in J&J's talcum powder products through 1993.  A September 14, 2017 *Bloomberg* article titled "Johnson & Johnson's Newest Talc Problem? Asbestos," noted that it was "the first suit to go to trial alleging some J&J talc products

---

[7] On December 19, 2018, the trial court judge denied a post-trial motion to set aside this verdict.

made decades ago were contaminated with asbestos." The *Bloomberg* article further noted that "many more cases are likely on the way."

76.      In April 2018, a New Jersey jury awarded $80 million in punitive damages and $37 million in compensatory damages to a plaintiff who claimed he contracted mesothelioma after more than thirty years of using JOHNSON'S Baby Powder.[8]  The following month, in May 2018, a California jury awarded $21.7 million in compensatory damages and $4 million in punitive damages to a plaintiff who alleged that frequent use of Johnson's baby powder caused her to contract mesothelioma.[9]

77.      On July 12, 2018, the Company was hit with a record-setting $4.69 billion verdict on claims that its products gave ovarian cancer to twenty-two women.[10]  Then, on March 13, 2019, a California state jury found J&J's talcum-based baby powder contained cancer-causing asbestos and caused a woman's mesothelioma, awarding nearly $29.5 million.[11]  According to a *Law360* article published that day, titled "J&J Hit With $29.5M Verdict in Latest Talc Trial," the jury of twelve unanimously found that the Company failed to adequately warn of a potential risk in the powder.  All but one juror found that J&J intentionally withheld facts germane to the safety of the product and a majority found the powder's "failure to perform safely" was a "substantial factor" in

---

[8] On June 29, 2018, the Judge in this case denied defendants' motion to overturn the judgment. J&J is appealing.

[9] On July 12, 2019, the Judge in this case denied J&J's petition for writ of error coram vobis.  The Company is now appealing the judgment.

[10] On December 19, 2018, the Judge in this case denied J&J's motion to overturn the $4.69 billion verdict.

[11] These judgments are currently on appeal.

the plaintiff's mesothelioma.  On March 27, 2019, the Company settled more lawsuits brought by individuals alleging asbestos in J&J's talcum powder products gave them mesothelioma.

78.     On September 11, 2019, a New Jersey state jury awarded four plaintiffs a combined $37.3 million in compensatory damages over claims they developed mesothelioma from using JOHNSON'S Baby Powder.  The jury found that the plaintiffs were exposed to asbestos in the Company's talc products and that such exposure was a substantial factor in causing their incurable disease.  In each decision, the jurors unanimously found the plaintiff was exposed to asbestos from J&J's talcum powder and voted 5-1 that the exposure was a substantial cause of the person's mesothelioma.

79.     Most recently, on September 27, 2019, a California jury awarded a plaintiff $40.3 million in damages after finding that J&J had sold asbestos-laden talcum powder that caused her to develop mesothelioma.  In addition to finding that J&J's talc was defective, the jury found that J&J's products had potential risks that were known or knowable to the Company in light of scientific and medical knowledge at the time of manufacture or sale, that those potential risks presented a substantial danger to people using those products, and that J&J failed to warn of the potential risks.

80.     Accordingly, defendants were long aware that J&J's talcum-based powders contain harmful cancer-causing materials.  Nonetheless, they have not stopped the Company from selling these products, and to this day J&J continues to sell these products.  Nor have defendants required the Company to include a cancer-related warning on its talc-based products despite the litigation and substantial expenditures the Company has already incurred and will continue to incur as a result of J&J's failure to warn of these health risks.

**J&J FIDUCIARIES MADE IMPROPER STATEMENTS CONCERNING THE QUALITY AND HEALTH RISKS ASSOCIATED WITH ITS PRODUCTS**

81. Despite knowledge that J&J's products were contaminated with cancer-causing asbestos, the Company's fiduciaries routinely touted the "long history of safe use" of its products and promised that J&J's products were, and had always been, free from asbestos. As detailed below, J&J's fiduciaries regularly represented that: (i) the Company's cosmetic powder products had been safe for over 100 years; and (ii) regular testing of these products had confirmed the absence of asbestos.

82. From February 2013 through November 2018, J&J filed its Quarterly Reports on Forms 10-Q with the SEC attesting to the accuracy of the financial results for the respective quarters. These Forms 10-Q contained certifications by defendant Gorsky pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that the financial information contained in the Forms 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

83. From February 2013 through February 2018, J&J filed its Annual Reports on Forms 10-K with the SEC attesting to the accuracy of the financial results for the preceding year. Defendants Gorsky, Mulcahy, Prince, Perez, I. Davis, Williams, Washington, McClellan, S. Davis, and Beckerle each signed all or a number of these Forms 10-K, and each contained SOX certifications by defendant Gorsky. The following table evidences the defendant signatories to each of the Forms 10-K filed between February 2013 and February 2018:

| Filing | Signatories |
|---|---|
| **10-K filed on February 22, 2013** | Gorsky, I. Davis, Mulcahy, Perez, Prince, Washington, and Williams |
| **10-K filed on February 21, 2014** | Gorsky, I. Davis, McClellan, Mulcahy, Perez, Prince, Washington, and Williams |

| 10-K filed on February 24, 2015 | Gorsky, I. Davis, S. Davis, McClellan Mulcahy, Perez, Prince, Washington, and Williams |
| 10-K filed on February 24, 2016 | Gorsky, Beckerle, I. Davis, S. Davis McClellan, Mulcahy, Perez, Prince, Washington, and Williams |
| 10-K filed on February 27, 2017 | Gorsky, Beckerle, I. Davis, S. Davis McClellan, Mulcahy, Perez, Prince, Washington, and Williams |
| 10-K filed on February 21, 2018 | Gorsky, Beckerle, I. Davis S. Davis, McClellan, Mulcahy, Perez, Prince, Washington, and Williams |

84.     On February 22, 2013, the Company filed its Annual Report on Form 10-K with the SEC announcing its financial results for the year ended December 31, 2012 (the "2012 Form 10-K").  The 2012 Form 10-K, signed by defendants Gorsky, I. Davis, Mulcahy, Prince, Perez, Williams, and Washington, represented that the Company was committed to "delivering high quality" and "improving existing products."  In particular, the 2012 Form 10-K stated:

**Research and Development**

Research activities represent a significant part of the Company's businesses. Research and development expenditures relate to the processes of discovering, testing and developing new products, ***improving existing products***, as well as demonstrating product efficacy and regulatory compliance prior to launch. ***The Company remains committed to investing in research and development with the aim of delivering high quality*** and innovative products.

85.     Exhibit 13 to the 2012 Form 10-K disclosed that some of J&J's subsidiaries were involved in product liability litigation, but misleadingly represented that its products contained adequate warnings and instructions.  In particular, the 2012 Form 10-K stated:

Certain subsidiaries of Johnson & Johnson are involved in numerous product liability cases. The damages claimed are substantial, and while ***these subsidiaries are confident of the adequacy of the warnings and instructions for use that accompany the products at issue***, it is not feasible to predict the ultimate outcome of litigation. The Company has established product liability accruals in compliance with ASC 450-20 based on currently available information, which in some cases may be limited. Changes to the accruals may be required in the future as additional information becomes available.

86.     The Company's subsequently filed financial reports similarly boasted that J&J "remain[ed] committed" to "delivering high quality" and "improving existing products,"[12] and that the warnings and instructions accompanying its products were adequate.[13]

87.     On April 25, 2013, *Forbes* reported on comments made by defendant Sneed at J&J's annual shareholder meeting.  According to the article, defendant Sneed boasted that the Company had made "great strides" in "really get[ting] past" the quality issues J&J faced.  In particular, the article stated:

> "One of the things that we wanted to be sure to do is move to ***really get past some of the challenges we've had as a business***," said Michael Sneed, VP of global corporate affairs. "***We've made great strides in that and we want to make sure we have a full conversation about who J&J is***. We're not perfect but we want people to understand that ***when we do make mistakes, we own up to those mistakes*** and ***we want people to understand the values that are behind J&J***."
>
> J&J ranked No. 6 of America's 150 most reputable companies this year, dropping from No. 3 last year, according to The Reputation Institute.
>
> "We certainly are not oblivious to the rankings," Sneed said. "The reputation of J&J is very important to us. We take it very seriously. We have a lot of data that we look at, both externally and internally," he said. "I wouldn't say there was any one thing that precipitated [the campaign], and we certainly don't do these things just for rankings. Reputation is something that's born out of actions. The reputation is a reflection of people's perspective on the actions that we do take."

---

[12] In particular, the Company made substantially similar statements in its: (i) Quarterly Report on Form 10-Q filed on May 3, 2013 (the "Q1 2013 Form 10-Q"); (ii) Quarterly Report on Form 10-Q filed on August 1, 2013 (the "Q2 2013 Form 10-Q"); (iii) Quarterly Report on Form 10-Q filed on November 4, 2013 (the "Q3 2013 Form 10-Q"); (iv) Annual Report on Form 10-K filed on February 21, 2014 (the "2013 Form 10-K"); (v) Quarterly Report on Form 10-Q filed on May 2, 2014 (the "Q1 2014 Form 10-Q"); (vi) Quarterly Report on Form 10-Q filed on August 1, 2014 (the "Q2 2014 Form 10-Q"); (vii) Annual Report on Form 10-K filed on February 24, 2015 (the "2014 Form 10-K"); (viii) Annual Report on Form 10-K filed on February 24, 2016 (the "2015 Form 10-K"); (ix) Annual Report on Form 10-K filed on February 27, 2017 (the "2016 Form 10-K); and (x) Annual Report on Form 10-K filed on February 21, 2018 (the "2017 Form 10-K").

[13] These statements were repeated in the Company's: (i) Q1 2013 Form 10-Q; (ii) Q2 2013 Form 10-Q; and (iii) Q3 2013 Form 10-Q.

The corporate campaign is the first global one, will continue indefinitely and will cost an estimated $20 million to $30 million for the remainder of the year.

It comes at a time when many businesses such as Nestle, Unilever UN +0% and Procter & Gamble PG +0.28% recognize the value of corporate branding in an increasingly transparent and accessible world driven by social media. "***We've really embraced transparency*** because we think we've got a great story to tell," Sneed said. "It has made us even more committed to making sure that we're part of the conversation wherever that conversation happens. Clearly, more of that conversation happens online and in the digital space. We love that things happen in real time. We get jazzed at being part of that," he said, adding that employees, particularly the younger ones, are excited by the company's involvement in social media, and "have become ambassadors for the brand."

Sneed also pointed out that J&J has a history of doing corporate campaigns -- for example, the Campaign for Nursing's Future, which has been running for 10 years.

"As we were thinking about what else we wanted to do, we thought it was important to reconnect with customers, healthcare professionals, and reconnect them to J&J and ***really [help them] understand the values behind J&J***. The campaign is about celebrating the people who do the work of caring for others and in a selfless manner."

The central theme of the new ads, the first from TBWA LA, is ***love -- "an expression of what people do when they care unconditionally for others***," Sneed said. "***That comes out of the history of J&J***."

88.     On July 16, 2013, the Company held an earnings conference call with investors and analysts to discuss its financial results for the second quarter ended June 30, 2013.  During the call, defendants' continued to assure investors and analysts that the Company paid careful attention to the safety of its products.  According to Sandra E. Peterson ("Peterson"), J&J's then Group Worldwide Chairman, J&J was "trying to ensure … the highest standard of quality for … safety" and that as part of a "quality initiative," the Company was identifying problems early and was correcting them.  In particular, Peterson stated:

…[O]ur quality effort is across the enterprise, across all of our businesses, our manufacturing sites as well as all of our R&D sites, because they are under the scope of ***trying to ensure that we have the highest standard of quality for the safety and care of our patients and consumers***. So, when we launched the quality

initiative a number of years ago, the focus really was on ensuring that we've got consistent quality standards.

\* \* \*

And we have, obviously as we've gone through all of this work, ***we have identified corrective actions, and we've immediately taken those corrective actions***.... We're putting in place processes and systems so that ***we have early warning systems in place to understand if we think there may be something going on with a product. So we identify it early and we go out and correct it***.

In addition to that, an important component of all of this is how we're managing our global supply chain. So, one of the very important changes that we have been making with our global supply chain is ***ensuring that all of our external suppliers -- so, our material suppliers -- are thoroughly reviewed, are thoroughly managed, and that they are living up to our quality standards***. And in that process in the last three years we've actually consolidated our external manufacturing, our external material suppliers by about one-third. So we have one-third less than we had three years ago. That means that we have an ability to manage them much more effectively, and ensure that we are reviewing their quality of their products coming into our facilities.

89.     On January 21, 2014, the Company held an earnings conference call with analysts and investors to discuss its financial results for the fourth quarter and fiscal year ended December 29, 2013.  During the conference call, defendant Gorsky boasted that J&J's Chief Medical and Chief Quality Officers were "setting new benchmarks for medical safety" and were ensuring the Company's products were safe.  Defendant Gorsky further assured investors and analysts that J&J had done and would continue to do "whatever it takes to ensure … the trust of consumers and patients."

90.     On February 21, 2014, the Company filed the 2013 Form 10-K with the SEC. Exhibit 13 to the 2013 Form 10-K explained that while some of J&J's subsidiaries were involved in product liability litigation, these subsidiaries had "substantial defenses."  In particular, the 2013 Form 10-K stated:

Certain subsidiaries of Johnson & Johnson are involved in numerous product liability claims and lawsuits involving multiple products. Claimants in these cases seek substantial compensatory and, where available, punitive damages. While ***these***

*subsidiaries believe they have substantial defenses*, it is not feasible to predict the ultimate outcome of litigation. The Company has established product liability accruals in compliance with ASC 450-20 based on currently available information, which in some cases may be limited. Changes to the accruals may be required in the future as additional information becomes available.

91.     The Company repeated the notion that it had "substantial defenses" against product liability claims in its subsequent filings with the SEC.  In particular, the Company made identical or substantially similar statements in its:  (i) Q1 2014 Form 10-Q; (ii) Q2 2014 Form 10-Q; (iii) Quarterly Report on Form 10-Q filed on October 30, 2014; (iv) 2014 Form 10-K; (v) Quarterly Report on Form 10-Q filed on May 1, 2015; (vi) Quarterly Report on Form 10-Q filed on July 31, 2015; (vii) Quarterly Report on Form 10-Q filed on October 30, 2015; (viii) 2015 Form 10-K; (ix) Quarterly Report on Form 10-Q filed on May 10, 2016; (x) Quarterly Report on Form 10-Q filed on August 4, 2016; (xi) Quarterly Report filed on November 4, 2016; (xii) 2016 Form 10-K; (xiii) Quarterly Report on Form 10-Q filed on May 8, 2017; (xiv) Quarterly Report on Form 10-Q filed on August 3, 2017; (xv) Quarterly Report on Form 10-Q filed on November 2, 2017; (xvi) 2017 Form 10-K; (xvii) Quarterly Report on Form 10-Q filed on May 1, 2018; (xviii) Quarterly Report on Form 10-Q filed on August 2, 2018; and (xix) Quarterly Report on Form 10-Q filed on October 31, 2018.

92.     On January 12, 2015, the Company participated in the JPMorgan Healthcare Conference, during which defendant Gorsky represented quality and safety as the Company's top priorities, stating:

*Quality and safety, our number-one priority* in dealing with patients and consumers. We've made a number of changes over the last few years, frankly to *make sure that we addressed any of the outstanding issues that we were facing*, but also more importantly to set us up for a benchmark going forward.

93.     On February 5, 2015, the Company published a story on its website titled "Making Every Moment Matter," written by defendant Glasgow.  Defendant Glasgow represented that J&J "look[ed] at all the science" "that help[s] babies thrive and grow," and stated:

> As a mom, I understand the need for other moms and dads to treasure the precious moments throughout the day we get to spend with our children. From bath time to bedtime, all of these moments turn into our very own special rituals and serve as a way to bond and develop a relationship with our little ones. What may come as a surprise to some is how all of these everyday interactions serve as the perfect opportunity to stimulate your baby's senses, which we believe can have a positive impact on their development.

> Working on JOHNSON'S®, I've had the chance to meet parents all over the world and look at the unique rituals and practices between them and their baby. What I found to be universal is the desire for families to raise happy, healthy babies.

> ***As the first baby care brand to commit to advancing the science of baby's skin, we feel, as scientists, an obligation to continue to take our research to the next level by looking at all the science– even beyond the science focused on cleansing– that help our babies thrive and grow***. It's why I am so excited about the new and existing research we are sharing that reveals the importance of multi-sensorial experiences that can lead to happy, healthy baby development.

> By age three, 85% of a baby's brain is developed so it's no surprise that every experience leading up to this time helps to shape their brain. From the nighttime cuddles to the bath time bubble splashing sessions, all of these interactions are giving you ***an opportunity to nurture your baby's ability to learn***, think, love and grow. And even more interesting is how the brain's processes for learning are enhanced when *multiple* senses are stimulated versus just using one. It's why ***I spend a lot of time looking at how touch and smell work together so we can help families make the little moments—like bath time (and what I like to call a sensorial playground )—mean so much more***.

> Looking into the future, JOHNSON'S® has earmarked millions of dollars over the next three years to advance new research and will continue to partner with leading experts in the space to uncover even more about the "science of the senses."

94.     On April 23, 2015, the Company held its Annual Shareholders Meeting, during which defendant Gorsky assured investors that J&J was committed to taking care of mothers and babies and helping people live healthier lives.  In particular, defendant Gorsky stated:

*Johnson & Johnson is committed to helping mothers and babies, we never want to forget the needs of the world's smallest patients.*

\*   \*   \*

*[C]aring inspires us day in and day out as we strive to make a difference for people who count on us the most*. And as the world's largest and best healthcare company in the world, we're committed to reaching more people in more places in more ways. *We're helping people ultimately live longer, healthier, and happier lives*.

95.     In a February 23, 2016 *Reuters* article, defendant Goodrich likewise boasted about the purported safety of talc, stating that it was "supported by decades of scientific evidence."  In particular, defendant Goodrich stated:

We have no higher responsibility than the health and safety of consumers, and we are disappointed with the outcome of the trial. We sympathize with the plaintiff's family but *firmly believe the safety of cosmetic talc is supported by decades of scientific evidence*.

96.     The following day, February 24, 2016, the Company created a page on its website titled, "The Facts About Talc Safety."  The page highlighted talc's purported long history of safe use, safety profile, and high purity, and represented that J&J's talc was free from asbestos.  In particular, the website page stated:

Baby Powder made from cosmetic talc is one of JOHNSON's oldest products and a longtime part of baby care rituals. JOHNSON's Baby Powder continues to be popular with adults as well, and in many parts of the world, it remains an essential part of the makeup and skin care routines. *With over 100 years of use, few ingredients have the same demonstrated performance, mildness and safety profile as cosmetic talc*.

We wanted to take this opportunity to share the facts about talc, *so you're well-informed*.

- *JOHNSON's talc products do not contain asbestos*. A frequent misperception is that JOHNSON's Baby Powder contains talc made with asbestos, a substance classified as cancer-causing. *Since the 1970s, talc used in consumer products has been required to be asbestos-free*. JOHNSON'S® Baby Powder products contain only U.S. Pharmacopeia

(USP) grade talc, which meets the highest quality, purity and compliance standards.

- ***The safety of talc is based on a long history of safe use and decades of research by independent researchers and scientific review boards***. Talc is accepted as safe for use in cosmetic and personal care products by the European Union, Canada and many other countries around the world, among them Argentina, Brazil, China, India, Israel, South Africa, Turkey and Indonesia. The U.S. Center for Disease Control (CDC), which identifies potential risk factors for many diseases, has not identified talc as a risk factor for ovarian cancer.

- The Nurses' Health Study (2010) and the Women's Health Initiative Observational Cohort (2014), the only two large-scale prospective studies looking at talc and ovarian cancer, found no causal relationship between talc and ovarian cancer.

\*   \*   \*

***The grade of talc used in cosmetics is of high purity***, comparable to that used for pharmaceutical applications, and ***is free from asbestos and asbestiform fibers. Cosmetic grade talc is only mined from select deposits from certified locations, and milled to relatively large, nonrespirable particles size***.

\*   \*   \*

***Our sources for talc undergo comprehensive qualification. The incoming talc is routinely evaluated using a sophisticated battery of tests designed to ensure quality, safety, and compliance with all global standards***.

97.     On May 2, 2016, the Company issued a press release wherein defendant Goodrich again touted the apparent safety of talc and multitude of scientific and regulatory reviews that determined it was safe.  In particular, defendant Goodrich stated:

Unfortunately***, the jury's decision goes against 30 years of studies by medical experts around the world that continue to support the safety of cosmetic talc***. We understand that women and families affected by ovarian cancer are searching for answers, and we deeply sympathize with all who have been affected by this devastating disease with no known cause. ***Johnson & Johnson has always taken questions about the safety of our products extremely seriously. Multiple scientific and regulatory reviews have determined that talc is safe for use in cosmetic products and the labeling on Johnson's Baby Powder is appropriate. For over 100 years, Johnson & Johnson has provided consumers with a safe choice for***

***cosmetic powder products*** and we will continue to work hard to exceed consumer expectations and evolving product preferences.

98.     That same day, on its website the Company published a page titled, "A Message About Talc," wherein J&J continued to represent that its talc products were safe.   The page contained assurances that out of "various governmental and non-governmental agencies" and expert panels "none have concluded that talc can cause cancer."  The website page also stated:

> ***30 years of studies by medical experts around the world, science, research and clinical evidence continues to support the safety of cosmetic talc. We first offered JOHNSON'S® Baby Powder as a product choice more than 100 years ago because we were confident in the safety of talc. And today, we continue to manufacture and sell JOHNSON'S® Baby Powder with talc because we remain completely confident in its safety. We remain committed to safety*** and innovation, and will continue to work hard to exceed consumer expectations and evolving product preferences. This commitment to innovation led to the introduction of JOHNSON'S® Baby Powder made with cornstarch as an additional option for consumers nearly forty years ago.

> Everyone at Johnson & Johnson sympathizes deeply with the women and families who have been affected by ovarian cancer, a devastating disease with no known cause. We know the women and families affected are searching for answers and want to understand the science.

> **Safety**

> ***When concerns about an association between talc and ovarian cancer were first raised in the early 1980s, Johnson and Johnson took them very seriously and did the things you expect from a company you trust including***:

> - ***Testing*** to ensure that the talc in JOHNSON'S® Baby Powder meets the highest Quality standards (US Pharmacopeia),
>
> - ***Engaging with the FDA, regulatory agencies, and governments*** around the world
>
> - ***Monitoring studies and all available information*** examining the safety of talc
>
> - ***Talking with independent consultants*** from outside our company about their point of view on the safety of talc.

- 44 -

> *After 30 years of studies by medical experts around the world, science, research and clinical evidence continues to support the safety of cosmetic talc*. Two widely-accepted, very large studies which followed women over a period of time – the Nurses' Health Study by the Harvard School of Public Health published in 2009 and the Women's Health Initiative Observational Cohort by the U.S. National Institutes of Health published in 2014 – found no association between talc and ovarian cancer. We also know that some epidemiology studies have reported an association between talc and ovarian cancer. However, *various governmental and non-governmental agencies as well as other expert panels have reviewed and analyzed all available data, and none have concluded that talc can cause cancer*.

> Concerns about the possible association between cosmetic talc with ovarian cancer increased after recent jury verdicts in the United States. It is natural for trial verdicts to raise questions about the product involved, and it's also important to distinguish jury verdicts – in the United States – from regulatory rulings or rigorous scientific findings. *Johnson &Johnson has always taken questions about the safety of our products extremely seriously*, especially concerns about products like JOHNSON'S® Baby Powder that families have trusted for generations. We continue to believe in the safety of JOHNSON'S® Baby Powder containing talc and we trust our consumers to make their own decisions – which are why we want to provide the scientific support for the safety of talc. Our goal is always to meet our consumer's needs and we are fortunate to have had this opportunity for more than 130 years.

99.     On May 18, 2016, during the Company's Consumer and Medical Devices Business Review Conference, Josh Ghaim ("Ghaim"), the Chief Technology Officer of JJCI, further boasted about the safety of the Company's products, stating:

> I'm going to start by saying there's a general assumption that people have natural is safe and most of the data we have actually that's not true. So there is a balance in terms of what products, what type of safety do we need to continue to build.

> And all of our products, especially when we start with Baby, the number of safety studies that we tend to do before we even put it in any of our product is a starting point. But we also understand that the natural trend continues to be a big opportunity.

> So we're working to that in terms of not just picking naturals but make sure that there is a benefit to it, make sure that it's safe, make sure that we can source it the right way because that's one of the biggest challenges. You can get natural ingredients but you can't guarantee that one lot to the next is actually consistently safe.

So for us I think we can see the trend. But at the same time *we're being very careful in terms of what raw materials we select, what type of safety studies that are needed*. Because more than anything else safety is the number one area that we need to continue to focus.

100.    On June 19, 2016, the *Houston Chronical* published an editorial wherein defendant Glasgow touted the apparent safety of talc and emphasized that the talc used in J&J's baby powder met the highest purity standard.  Defendant Glasgow stressed that J&J "carefully select[s] and process[es] the talc used in all [its] global production to be asbestos-free" and confirmed that its talc was asbestos-free with regular testing.  In particular, defendant Glasgow stated:

At Johnson & Johnson Consumer Inc., *we are guided by the medical facts and science* when it comes to our products. *Cosmetic talc is safe, and 30 years of scientific studies and regulatory reviews have shown this to be true*.

This counters the claims of so-called experts, paid to testify on behalf of plaintiffs, who say decisions by juries should trump the overwhelming scientific data.

We first offered Johnson's Baby Powder as a product choice more than 100 years ago. Today, we continue to manufacture and sell Johnson's Baby Powder with talc because *the science supports its safety*.

Ovarian cancer is a devastating disease, and we recognize that women and families affected by this disease are searching for answers and want to understand the science. When concerns about an association between talc use and ovarian cancer were raised, *we started doing the things you expect from a company you trust, including testing* to ensure the talc in our products meets the highest quality standards, *meeting with regulators and governments* around the world, *looking closely at the studies and available information*, and *talking with independent consultants*.

*The facts are clear. The studies, science, research and clinical evidence have continued to support the safety of cosmetic talc*. Most recently, two widely-accepted, very large studies which followed women over a long period of time – the Nurses' Health Study by the Harvard School of Public Health published in 2009 and the Women's Health Initiative Observational Cohort by the U.S. National Institutes of Health published in 2014 – found no association between talc use for feminine hygiene and ovarian cancer.

There have been some studies that reported an association between talc and ovarian cancer.

In my job as a scientist, terms and words matter when it comes to studies, and an "association" does not mean something causes a specific result. Additionally, *many in the scientific community have concluded that the data from those studies are inconclusive because of how the studies were conducted. Various governmental and non-governmental agencies, such as the U.S. Food and Drug Administration (FDA)* and National Cancer Institute, *as well as other expert panels have reviewed and analyzed the available data and concluded that there is insufficient evidence linking talc use to ovarian cancer*.

Johnson's Baby Powder products contain only U.S. Pharmacopeia grade talc to ensure *it meets the highest quality, purity and compliance standards*. *We also carefully select and process the talc used in all our global production to be asbestos-free, and have confirmed this with regular testing since the 1970s*. The U.S. FDA has also independently tested and confirmed the purity of the talc used in our cosmetic products.

We trust our consumers to make their own decisions, which is why we will continue to provide consumers with the facts. As a scientist, and most importantly, as a parent, I can tell you *the science is clear – cosmetic talc is, and has been, safe for use* and *that is the most important guiding principle for every product Johnson & Johnson Consumer Inc. offers to consumers and patients*.

101.    Around that time, the Company's website also touted the safety and effectiveness of the talc in J&J's products.  In particular, the website boasted that "decades of science have reaffirmed [talc's] safety," and stated:

**In our products**

We continue to use talc in our products like JOHNSON'S baby powder because *decades of science have reaffirmed its safety*. Because of its safety and effectiveness, we confidently include pharmaceutical grade talc in our products. Your trust in our products and your confidence using them every day is a huge responsibility—that's why *we only use ingredients in our products deemed safe by the latest science*.

*Science, research, clinical evidence and 30 years of studies by medical experts around the world continue to support the safety of cosmetic talc*. Health authorities in the U.S. and around the world have reviewed the data. Talc is accepted for use in countries around the world, including the United States, European Union, Canada, Argentina, Brazil, China, India, Israel, South Africa, Turkey, and Indonesia.

When you read a new study or expert opinion, it's easy to be swayed one way or another. ***We take any questions about our product's safety seriously*** and as a result have dug deep into the evidence and science on talc.

102.     On January 24, 2017, a page on the Company's website titled "The Facts on Talcum Powder Safety" contained assertions by defendant Glasgow touting the safety of talc and the scientific work supporting talc's apparent safety.  In particular, the website page stated:

When it comes to the safety of the products we make, we're just like you...

We want all the information we can get. We seek out the guidance of experts and we monitor the latest science to see if it impacts any of our products. We also listen to the people who use our products so we can take their experiences into account. ***Safety is a priority for all of our consumer products because they go into your home and into ours. Safety is a value we all share***.

With all the types of information we use to make products, ***there is no information more important than our research on scientific data and safety***. We go beyond the findings of a single study because we must ensure we've assembled ***all of the available data*** from multiple scientific areas to reach conclusions based on evidence. One opinion or study can't outweigh ***decades of conclusive, scientific, evidence-based findings***. As a scientist and, equally important, as a parent myself, ***I can tell you the science is clear: Cosmetic talc is, and has been, safe for use in consumer products***.

We are all mothers, fathers, and consumers ourselves; we understand and take seriously our responsibility to give you the information you need to make your own decisions. We created this site to help you find the facts about talc more easily. You'll learn where talc comes from, how it is used in everyday products, and why ***it is safe to use as part of your personal care routine***. We first offered JOHNSON'S® Baby Powder … as a product choice more than 100 years ago. Today, our consumer division continues to manufacture and sell JOHNSON'S® Baby Powders with ingredients like talc and cornstarch. We choose to include these ingredients not simply because we've used them for decades. ***We include them because decades of scientific work support their safety***. We hope that by reviewing this collection of facts about talc, you'll feel as confident in its safety and efficacy as we do.

103.     On February 27, 2017, the Company filed the 2016 Form 10-K, which discussed general risks and uncertainties facing J&J, including legal proceedings, but represented that the Company had "substantial defenses in these matters."  In particular, the 2016 Form 10-K stated:

**The Company is subject to significant legal proceedings that can result in significant expenses, fines and reputational damage**.

In the ordinary course of business, Johnson & Johnson and its subsidiaries are subject to numerous claims and lawsuits involving various issues such as patent disputes, product liability and claims that their product sales, marketing and pricing practices violate various antitrust, unfair trade practices and/or consumer protection laws. The most significant of these proceedings are described in Note 21, "Legal Proceedings" under Notes to the Consolidated Financial Statements included in Item 8 of this Report. While ***the Company believes it has substantial defenses in these matters***, it is not feasible to predict the ultimate outcome of litigation. The Company could in the future be required to pay significant amounts as a result of settlements or judgments in these matters, potentially in excess of accruals. The resolution of, or increase in accruals for, one or more of these matters in any reporting period could have a material adverse effect on the Company's results of operations and cash flows for that period. Furthermore, as a result of cost and availability factors, effective November 1, 2005, the Company ceased purchasing third-party product liability insurance.

**Product reliability, safety and effectiveness concerns can have significant negative impacts on sales and results of operations, lead to litigation and cause reputational damage**.

Concerns about product safety, whether raised internally or by regulators or consumer advocates, and whether or not based on scientific evidence, can result in safety alerts, product recalls, governmental investigations, regulatory action on the part of the FDA (or its counterpart in other countries), private claims and lawsuits, payment of fines and settlements, declining sales and reputational damage. These circumstances can also result in damage to brand image, brand equity and consumer trust in the Company's products. Product recalls have in the past, and could in the future, prompt government investigations and inspections, the shutdown of manufacturing facilities, continued product shortages and related sales declines, significant remediation costs, reputational damage, possible civil penalties and criminal prosecution.[14]

104.    On September 6, 2017 the Company participated in the Wells Fargo Healthcare Conference, during which defendant Gorsky addressed the talc litigation.  During the conference, defendant Gorsky explained that the safety of talc was "clearly demonstrate[d]" by "more than …

---

[14] These representations were repeated in substantial part in the Company's 2017 Form 10-K.

100 years of experience" and the "significant amount of clinical information [and] control data in [their] category."  Defendant Gorsky further stated:

> *….[W]e always put patient and consumer safety first in everything that we do*. That being said, we think that *the significant amount of clinical information, control data in this category, both from agencies, such as the NCI as well as the FDA, clearly demonstrates the safety of talc*, and by the way, *from more than a 100 years of experience.* That being said, we were disappointed with some of the early results, for example, in St. Louis. We're encouraged by some of the recent rulings out of Supreme Court regarding those venues. We've also been encouraged by some of the earlier findings in New Jersey. We were disappointed with the first outcome in California but, nonetheless, we feel that *we have some strong ground on the field going forward*. And again, *we remain, based upon the data, confident of the position that we're taking*.

### THE TRUTH GRADUALLY EMERGES WHILE THE COMPANY'S FIDUCIARIES CONTINUE TO MISLEAD THE MARKET

105.    On January 16, 2018, Fair Warning, a nonprofit investigative news organization, published an article revealing that J&J was aware of asbestos concerns by at least the 1970s.  The article, titled "Baby Powder Battles: Johnson & Johnson Internal Documents Reveal Asbestos Worries," cited internal documents recognizing "potential asbestos content," in J&J's talc-based products and occasional "sub-trace quantities" of what "might be classified as asbestos fiber."  The report also referenced a 1974 internal document from the Company's mining operation that recognized J&J's need to ensure that asbestos was not present in its talc and noted that such materials presented "a severe health hazard" and were "potentially present in all talc ores in use at [that] time."

106.    On February 5, 2018, Mesothelioma.net published an article titled "Johnson & Johnson Mesothelioma Trial Likely to Expose Company Documents."  The article, referring to a lawsuit filed against J&J in New Jersey state court by Stephen Lanzo who allegedly developed mesothelioma on account of his exposure to JOHNSON'S Baby Powder that contained asbestos

(the "Lanzo Litigation"), reported that "experts are anticipating the release of numerous damaging internal company documents."  In particular, the article stated:

> As a new mesothelioma lawsuit against Johnson & Johnson proceeds in a New Jersey courtroom, *experts are anticipating the release of numerous damaging internal company documents*. These memos and reports show that as long ago as the early 1970s, company executives were questioning each other about the impact of asbestos, and specifically about how much asbestos an infant might inhale if the company's baby powder contained a 1% concentration of the carcinogen. These documents are likely to weigh heavily against the consumer products giant as they say in court that their product has always been completely asbestos free.

107.    On this news, J&J's stock fell $7.29 per share, or approximately 5%, from its previous closing price to close at $130.39 per share on February 5, 2018, erasing more than $19.5 billion in market capitalization.

108.    Media outlets reporting on the stock drop confirmed that the stock fell in response to reports that damaging internal J&J documents were about to be revealed.  For example, a February 5, 2018 CNBC article titled "Johnson & Johnson Falls on Report that Lawsuits Could Expose Potentially Damaging Documents," stated:

> *Shares of Johnson & Johnson fell Monday on a report that court proceedings could expose potentially damaging documents*.
>
> J&J is facing numerous lawsuits claiming its talc products such as Johnson's Baby Powder caused cancer. The company has insisted its baby powder does not contain asbestos and causes neither mesothelioma nor ovarian cancer.
>
> *    *    *
>
> *J&J's stock fell 5 percent on Monday*. Jefferies analyst Jared Holz said the report reads poorly, but he doubts it will have a real impact.
>
> In a note to investors, Wells Fargo analyst Larry Biegelsen said the concerns on the talc lawsuits "appear overblown."
>
> Even if J&J settled all 5,500 cases for $280,000 per case (the highest amount among liability cases in the drug and device sectors the firm has tracked), the total liability to J&J would be $1.5 billion, he wrote. At the end of the fourth quarter, J&J had $18.4 billion of cash and marketable securities.

109.    In April 2018, the jury in the Lanzo Litigation found the Company and its talc supplier liable for the plaintiff's mesothelioma and awarded the plaintiff $117 million. Notwithstanding the verdict and magnitude of the damages, J&J continued to deny that its products contain cancer-causing toxins.  For example, a *New York Daily News* article quoted defendant Goodrich as stating:  "Johnson's Baby Powder has been used for more than 120 years and it does not contain asbestos or cause mesothelioma…. We believe that once the full evidence is reviewed, this decision will be reversed."

110.    The following month, May 2018, J&J relaunched its iconic baby product line.  In a May 16, 2018 interview with CNBC, defendant Gorsky claimed that the Company had "taken out many of the concerning ingredients that mothers didn't want."  Defendant Gorsky also boasted that J&J's clinical data and information showed that the Company's talc powder was safe.  During the Company's Consumer and Medical Devices Business Review Conference held that day, defendant Ghaim assured investors that when it came to J&J's baby products, "[its] ingredients have … always been safe."  Jorge S. Mesquita ("Mesquita"), Executive Vice President and Worldwide Chair of JJCI made similar assurances, promising that "we've been through this extensively, and we are 100% sure that our talc product is safe."  In a CNBC article published that same day, Mesquita reiterated that "[w]e are absolutely certain that science shows that our talcum product is safe."

111.    On July 12, 2018, the Company was hit with a record-setting $4.69 billion verdict on claims that its products gave ovarian cancer to twenty-two women.  When news of the verdict reached the market, J&J's stock fell $3.07 per share to close at $124.69 per share on July 16, 2018, erasing more than $8.2 billion in market capitalization in two trading days.

112.    Rather than reveal the truth about the Company's toxic products, defendants continued to boast that J&J's products did not contain asbestos and do not cause ovarian cancer. For example, during the Company's earnings conference call on July 17, 2018, defendant Gorsky addressed the $4.69 billion verdict and assured investors that "we remain confident that our products do not contain asbestos and do not cause ovarian cancer."  Defendant Gorsky further insisted that "preeminent scientific and regulatory bodies ... have fully reviewed the full body of scientific evidence on multiple occasions and found that it does not support the allegation that talc causes ovarian cancer."

113.    On December 14, 2018, *Reuters* published an in-depth investigative report titled, "Special Report: J&J Knew for Decades that Asbestos lurked in its Baby Powder," revealing previously unreleased internal Company documents that detailed J&J's knowledge of asbestos in the Company's talc products.  According to the report, "at least three tests by three different labs from 1972 to 1975 had found asbestos in [J&J's] talc – in one case at levels reported as 'rather high.'"  The report further explained:

> A *Reuters* examination of many of those [J&J] documents, as well as deposition and trial testimony, shows that ***from at least 1971 to the early 2000s, the company's raw talc and finished powders sometimes tested positive for small amounts of asbestos, and that company executives, mine managers, scientists, doctors and lawyers fretted over the problem and how to address it while failing to disclose it to regulators or the public***.

> The documents also depict ***successful efforts to influence U.S. regulators' plans to limit asbestos in cosmetic talc products and scientific research on the health effects of talc***.

> A small portion of the documents have been produced at trial and cited in media reports. ***Many were shielded from public view by court orders that allowed J&J to turn over thousands of documents it designated as confidential. Much of their contents is reported here for the first time***.

114.     Among other things, the *Reuters* report provided the full internal draft of the Company's "Our Safety & Care Commitment," which evidenced J&J's internal recognition that the use of talc for over 100 years was not safe.  The draft for the website contained the following edit: "Talc has over 100 years of ~~*safe*~~ use in personal care products."  The previous draft also stated that "I don't think we can link cosmetic talc to 100 years of use," and that "we cannot say 'always'" when it comes to asbestos not being in J&J's talcum powder products.

115.     The draft language also evidenced defendants' awareness that the science on talc and ovarian cancer was not demonstrably in J&J's favor.   In particular, the draft language acknowledged that there were other scientific sources that were not included on the website because "they [were] not as definitive or supportive and could be interpreted as suggesting a causal effect," including from the American Cancer Society and IARC.  Indeed, the draft language for the website specifically informed defendant Goodrich that "[e]ven some of the studies we cite send mixed messages."  Further, defendant Goodrich was also informed that one of the studies J&J cited actually acknowledged that "perineal talc use may modestly increase the risk of invasive serous ovarian cancers."

116.     In addition, the *Reuters* report provided new details regarding J&J's early awareness of the dangers of tremolite in the Company's talc, stating:

> …[I]n an April 9, 1969, memo to a company doctor, ***Ashton said it was "normal" to find tremolite in many U.S. talc deposits***. He suggested J&J rethink its approach. "Historically, in our Company, Tremolite has been bad," Ashton wrote. "How bad is Tremolite medically, and how much of it can safely be in a talc base we might develop?"

> Since pulmonary disease, including cancer, appeared to be on the rise, "it would seem to be prudent to limit any possible content of Tremolite ... to an absolute minimum," came the reply from another physician executive days later.

> The doctor told Ashton that J&J was receiving safety questions from pediatricians. ***Even Robert Wood Johnson II, the founder's son and then-retired CEO, had***

expressed *"concern over the possibility of the adverse effects on the lungs of babies or mothers*," he wrote.

"We have replied," the doctor wrote, that "we would not regard the usage of our powders as presenting any hazard." *Such assurances would be impossible, he added, "if we do include Tremolite in more than unavoidable trace amounts*." The memo is the earliest J&J document reviewed by Reuters that discusses tremolite as more than a scratchy nuisance. *The doctor urged Ashton to consult with company lawyers because "it is not inconceivable that we could become involved in litigation*."

117.   Furthermore, contrary to defendants' representations about early talc testing, the *Reuters* article disclosed that "at least three tests by three different labs from 1972 to 1975 had found asbestos in [J&J's] talc – in one case at levels reported as 'rather high.'"  In particular, the article stated:

In 1976, as the U.S. Food and Drug Administration (FDA) was weighing limits on asbestos in cosmetic talc products, *J&J assured the regulator that no asbestos was "detected in any sample" of talc produced between December 1972 and October 1973. It didn't tell the agency that at least three tests by three different labs from 1972 to 1975 had found asbestos in its talc – in one case at levels reported as "rather high*."

118.   *Reuters* also reported that the Company had never adopted a concentration method for its asbestos testing, even after being informed that it was "[t]he best way to detect asbestos in talc," and even after J&J's own researchers used such a method to successfully identify asbestos in Vermont talc.  In particular, the report stated:

*The best way to detect asbestos in talc was to concentrate the sample* and then examine it through microscopes, the Colorado School of Mines Research Institute told J&J in a Dec. 27, 1973, report. In a [May 1973] memo, a J&J lab supervisor said *the concentration technique, which the company's own researchers had earlier used to identify a "tremolite-type" asbestos in Vermont talc*, had one limitation: "*It may be too sensitive*."

*   *   *

*[T]he company never adopted the Colorado lab's 1973 recommendation that samples be concentrated* before examination under a microscope. And the talc samples that were subjected to the most sensitive electron microscopy test were a

- 55 -

tiny fraction of what was sold. For those and other reasons, J&J couldn't guarantee its Baby Powder was asbestos-free when plaintiffs used it, according to experts, including some who testified for plaintiffs.

As early as 1976, Ashton, J&J's longtime talc overseer, recognized as much in a memo to colleagues. He wrote that *talc in general, if subjected to the most sensitive testing method, using concentrated samples, "will be hard pressed in supporting purity claims." He described this sort of testing as both "sophisticated" and "disturbing*."

119.    In a companion piece titled, "A Guiding Hand on Talc Safety Research," *Reuters* reported that J&J had engaged in a scheme to influence scientific research.  According to the article, J&J had been able "to neutralize or hold in check data already generated by investigators who question the safety of talc."  The article further stated:

> *J&J's effort to protect its iconic Baby Powder franchise by shaping research was led by physician and scientist executives*. An early 1970s study of 1,992 Italian talc miners shows how it worked: *J&J commissioned and paid for the study, told the researchers the results it wanted, and hired a ghostwriter* to redraft the article that presented the findings in a journal.
>
> The effort entailed *other attempts to influence research*, including a U.S. government study of the health of talc workers in Vermont. J&J's Windsor Minerals Inc. subsidiary, one of several mine operators involved in the study, developed a relationship with the U.S. National Institute of Occupational Safety and Health researchers to "*even influence the conclusions" through suggestions of "subjective interpretations*," according to a 1973 Windsor Minerals memo.

120.    On this news, J&J's stock plunged $14.84 per share, or more than 10%, from its previous closing price to close at $133 per share on December 14, 2018, erasing nearly *$40 billion* in market capitalization.

121.    Analysts noted that the information exposed by the *Reuters* report directly refuted defendants' repeated denials that J&J's products contained harmful cancer-causing materials.  For example, a February 14, 2019 *Seeking Alpha* article pointed out that the *Reuters* report "revealed that [J&J] executives were aware of the presence of asbestos in the company's raw and finished talc powders & attempted to conceal the findings from the public."  The *Seeking Alpha* article also

explained how J&J was able to hide the truth from the public until the *Reuters* report revealed it. In particular, the article stated:

> The happy-go-lucky attitude of JNJ longs regarding the ongoing talcum powder/asbestos lawsuits was an understandable phenomenon. Scientific findings showed a tenuous connection between talc and asbestos with conflicting data, a perfect recipe for long incredulity. Reuters journalists left very little room for skepticism, however, following the special report published in December.
>
>       \*   \*   \*
>
> Documents highlighted in the Reuters report show that JNJ executives were not only aware of numerous internal and external reports of asbestos in JNJ talc powders, but actively stifled the findings without remedy.

122.    As a direct and proximate result of the mismanagement and misreporting by defendants, the Company and defendants Gorsky, Goodrich, Casalvieri, Sneed, and Glasgow are now the subject of the Securities Class Action.  The Securities Class Action alleges violations of the federal securities laws, including causes of action under sections 10(b) and 20(a) of the Exchange Act, in connection with false statements concerning J&J's talcum powder products.

## DAMAGES TO J&J

123.    The Individual Defendants' participation in the wrongdoing detailed above and failure to remedy the Company's improper business practices have exposed J&J to billions of dollars in liability for individual and class action lawsuits filed on behalf of consumers of J&J's talc-based products.  As of December 30, 2018, there are approximately 13,000 plaintiffs with pending claims against J&J for injuries caused by its talc-based body powders.  And the Company has already been hit with billions of dollars in judgments on claims that its products cause ovarian cancer.  On July 12, 2018, the Company was hit with a record-setting $4.69 billion verdict on claims that its products gave ovarian cancer to twenty-two women.  Then, on March 13, 2019, a California state jury found J&J's talcum-based baby powder contained cancer-causing asbestos and caused a woman's mesothelioma, awarding nearly $29.5 million.  On March 27, 2019, the

Company settled more lawsuits alleging asbestos in its talcum powder products gave them mesothelioma. Given that the Company continues to sell its cancer-causing talc-based products, J&J will continue to incur significant expenses, fines, and other damages for the foreseeable future.

124. The Company's improper statements and the Individual Defendants' unwillingness to halt J&J's sales of products contaminated with cancer-causing asbestos also damaged its reputation within the business community and in the capital markets. In addition to price and product quality, J&J's current and potential customers consider a company's ability to curb known abuses and implement adequate controls to ensure illegal practices are timely discovered and properly addressed. Customers are less likely to do business with companies that knowingly permit and/or encourage unscrupulous behavior, and investors are less likely to invest in companies that lack internal controls and fail to timely disclose material information.

125. Further, as a direct and proximate result of the Individual Defendants' actions, J&J has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement or adverse judgment in the Securities Class Action;

(b)    costs incurred from defending and paying any settlement or adverse judgment in the ERISA class action lawsuits;

(c)    costs incurred from defending and paying any settlement or adverse judgment in the thousands of product liability lawsuits stemming from the Company's cancer-causing products;

(d)    costs incurred from complying with the governmental investigations resulting from the improper practices detailed above; and

(e)      costs incurred from compensation and benefits paid to the defendants who have breached their duties to J&J.

## DERIVATIVE AND DEMAND ALLEGATIONS

126.    Plaintiff brings this action derivatively in the right and for the benefit of J&J to redress injuries suffered, and to be suffered, by J&J as a direct result of breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. J&J is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

127.    Plaintiff will adequately and fairly represent the interests of J&J in enforcing and prosecuting its rights.

128.    Plaintiff was a stockholder of J&J at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current J&J stockholder.

129.    In accordance with New Jersey law, on April 18, 2019, plaintiff sent the Demand to the J&J Board to investigate, address, remedy, and commence proceedings against certain of the Company's current and former officers and directors for mismanagement and breaches of fiduciary duties.[15]   To date, the Board has refused to substantively respond to the Demand and, upon information and belief, refused to take any action demanded.

130.    Plaintiff received a response letter from the Company on May 3, 2019.   The Company's letter stated that Gibson Dunn & Crutcher LLP was investigating the "underlying matters regarding the Company's talc products addressed in [the Demand]."  With respect to details

---

[15] A true and correct copy of the Demand is attached hereto as Exhibit A.

of the investigation, the letter merely provided that the investigation was "underway and is currently in the fact-gathering stage."

131.    Five months have now passed since plaintiff sent the Demand, yet the Board has not provided a substantive response despite the obligation under N.J.S.A. 14A:3-6.3 to respond to the Demand within ninety days.[16]  The Board's lackadaisical response to the Demand is contrary to New Jersey law, and this delay demonstrates that the Board is acting in bad faith in considering the Demand.  Accordingly, no further delay is warranted or appropriate here, and thus, in accordance with New Jersey law, plaintiff is entitled to pursue this action.

132.    Plaintiff has not made any demand on the other stockholders of J&J  to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    J&J is a publicly held company with over 2.6 billion shares outstanding and thousands of stockholders as of July 24, 2019;

(b)    making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)    making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

<u>**COUNT I**</u>

**Against the Individual Defendants for Breach of Fiduciary Duty**

133.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

---

[16] Under the statutory requirements, the required ninety-day period expired on July 17, 2019.

134.    The Individual Defendants owed and owe J&J fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe J&J the highest obligation of good faith, fair dealing, loyalty, and due care.

135.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of good faith and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within J&J, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

136.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants knowingly, recklessly, or were gross negligence: (i) allowed the Company to sell body powders contaminated with cancer-causing-asbestos; (ii) failed to warn consumers of the link between the use of talc-based body powders in the genital region and ovarian cancer; and (iii) made or allowed the Company to make improper statements in its press releases and public filings with the SEC.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

137.    The Director Defendants, as directors of the Company, owed J&J the highest duty of loyalty.   These defendants breached their duty of loyalty by knowingly or recklessly: (i) allowing the Company to sell body powders contaminated with cancer-causing-asbestos; (ii) failing to warn consumers of the link between the use of talc-based body powders in the genital region and ovarian cancer; and (iii) making or allowing the Company to make improper statements in its press releases and public filings with the SEC.   Accordingly, these defendants breached their duty of loyalty to the Company.

138.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, J&J has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

139.     Plaintiff, on behalf of J&J, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

140.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

141.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of J&J.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to J&J.

142.     Plaintiff, as a stockholder and representative of J&J, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

143.     Plaintiff, on behalf of J&J, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of J&J, demands judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties and unjust enrichment;

B.     Directing J&J to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect J&J and its

stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to implement sophisticated testing methods adequate to detect the presence of harmful chemicals in the Company's products;

2.      a proposal to strengthen the Company's controls over marketing and sales of talc-based products;

3.      a proposal to strengthen J&J's oversight of its disclosure procedures;

4.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

5.      a provision to permit the stockholders of J&J to nominate at least three candidates for election to the Board;

C.      Injunctive relief barring the Company from selling its asbestos-containing products or requiring the J&J to include a warning on its products that talc has been found to cause cancer;

D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of J&J has an effective remedy;

E.      Awarding to J&J restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

F.      Awarding to plaintiff the costs and disbursements of the action, including

reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  October 10, 2019                         HERMAN JONES LLP

                                                 s/ Serina M. Vash
                                                 SERINA M. VASH (NJ Bar. No. 041142009)
                                                 153 Central Avenue #131
                                                 Westfield, NJ 07090
                                                 svash@hermanjones.com
                                                 Telephone: (404) 504-6516
                                                 Facsimile: (404) 504-6501

                                                 HERMAN JONES LLP
                                                 JOHN C. HERMAN (GA Bar No. 348370)*
                                                 3424 Peachtree Road, N.E., Suite 1650
                                                 Atlanta, GA 30326
                                                 Telephone:  (404) 504-6500
                                                 Facsimile:  (404) 504-6501

                                                 ROBBINS ARROYO LLP
                                                 BRIAN J. ROBBINS*
                                                 CRAIG W. SMITH*
                                                 SHANE P. SANDERS*
                                                 5040 Shoreham Place
                                                 San Diego, CA 92122
                                                 Telephone: (619) 525-3990
                                                 Facsimile: (619) 525-3991

                                                 Attorneys for Plaintiff

                                                 *pro hac vice motions to be filed

1397945